IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DONNA MARTIN o/b/o HKB, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 1:11CV651-SRW |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

Donna Martin o/b/o HKB[1] brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her child's application for Supplemental Security Income under the Social Security Act.  Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**STANDARD OF REVIEW**

The court's review of the Commissioner's decision is narrowly circumscribed.  The court does not reweigh the evidence or substitute its judgment for that of the Commissioner.  Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145

---

[1] The court refers to HKB as the "plaintiff" in this recommendation.

(11th Cir. 1991). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). Factual findings that are supported by substantial evidence must be upheld by the court. See Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence."). The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

### Child Disability

"Federal regulations set forth the process by which the SSA determines if a child is disabled and thereby eligible for disability benefits." Shinn ex rel. Shinn v. Commissioner of Social Sec., 391 F.3d 1276, 1278 (11th Cir. 2004) (citing 42 U.S.C. § 1382c(a)(3)(C)(I) and 20 C.F.R. § 416.906). "The process begins with the ALJ determining whether the child is 'doing substantial gainful activity,' in which case she is considered 'not disabled' and is ineligible for benefits." Id. (citing 20 C.F.R. §§ 416.924(a), (b)). "The next step is for the

ALJ to consider the child's 'physical or mental impairment(s)' to determine if she has 'an impairment or combination of impairments that is severe.'" Id. (citing 42 U.S.C. §§ 416.924(a), (c)).  "For an applicant with a severe impairment, the ALJ next assesses whether the impairment 'causes marked and severe functional limitations' for the child." Shinn, 391 F.3d at 1278  (citing 20 C.F.R. §§ 416.911(b), 416.924(d).)  This determination is made according to objective criteria set forth in the Code of Federal Regulations (C.F.R.). As the Eleventh Circuit has explained,

> [t]he C.F.R. contains a Listing of Impairments ["the Listings", found at 20 C.F.R. § 404 app.] specifying almost every sort of medical problem ("impairment") from which a person can suffer, sorted into general categories. See id. § 416.925(a). For each impairment, the Listings discuss various limitations on a person's abilities that impairment may impose. Limitations appearing in these listings are considered "marked and severe." Id. ("The Listing of Impairments describes ... impairments for a child that cause[ ] marked and severe functional limitations.").
>
> A child's impairment is recognized as causing "marked and severe functional limitations" if those limitations "meet[ ], medically equal[ ], or functionally equal[ ] the [L]istings." Id. § 416.911(b)(1); see also §§ 416.902, 416.924(a). A child's limitations "meet" the limitations in the Listings if the child actually suffers from the limitations specified in the Listings for that child's severe impairment. A child's limitations "medically equal" the limitations in the Listings if the child's limitations "are at least of equal medical significance to those of a listed impairment." Id. § 416.926(a)(2).

Id. at 1278-79. "Finally, even if the limitations resulting from a child's particular impairment[s] are not comparable to those specified in the Listings, the ALJ can still conclude that those limitations are 'functionally equivalent' to those in the Listings.  In making this determination, the ALJ assesses the degree to which the child's limitations

3

interfere with the child's normal life activities. The C.F.R. specifies six major domains of life:

>  (i) Acquiring and using information;
>
>  (ii) Attending and completing tasks;
>
>  (iii) Interacting and relating with others;
>
>  (iv) Moving about and manipulating objects;
>
>  (v) Caring for [one]self; and
>
>  (vi) Health and physical well-being."

Shinn, 391 F.3d at 1279 (citing 20 C.F.R. § 416.926a(b)(1)). "The C.F.R. contains various 'benchmarks' that children should have achieved by certain ages in each of these life domains." Id. (citing 20 C.F.R. §§ 416.926a(g)-(l)). "A child's impairment is 'of listing-level severity,' and so 'functionally equals the listings,' if as a result of the limitations stemming from that impairment the child has 'marked' limitations in two of the domains [above], or an 'extreme' limitation in one domain." Id. (citing 20 C.F.R. § 416.926a(d) and § 416.925(a)).[2]

### The ALJ's Decision

---

[2] " A 'marked' limitation is defined as a limitation that 'interferes seriously with [the] ability to independently initiate, sustain, or complete activities,' and is 'more than moderate.'" Henry v. Barnhart, 156 Fed. Appx. 171, 174 (11th Cir. 2005)(citing 20 C.F.R § 416.926a(e)(2)(i)). "An 'extreme' limitation is reserved for the 'worst limitations' and is defined as a limitation that 'interferes very seriously with [the] ability to independently initiate, sustain, or complete activities,' but 'does not necessarily mean a total lack or loss of ability to function.'" Id. (citing 20 C.F.R. § 416.926a(e)(3)(i)).

In a decision issued on September 20, 2010, the ALJ found that the plaintiff – an older infant when the application was filed and a preschooler at the time of the ALJ's decision – suffers from the severe impairment of asthma, but that she does not have an impairment or combination of impairments that meets, medically equals, or functionally equals a listed impairment. The ALJ determined that the plaintiff has "less than marked" limitations in the domain of "Health and Physical Well-Being" and no limitation in the remaining domains. The ALJ concluded, accordingly, that the plaintiff has not been disabled since October 20, 2008, the date her application was filed. (R. 19-30). The Appeals Council denied plaintiff's request for review of the ALJ's decision (R. 1-6) and plaintiff commenced the present action thereafter (Doc. # 1).

**Listing 103.03**

Plaintiff argues that the Commissioner's decision is not supported by substantial evidence and is due to be reversed because the ALJ erred in failing to find that her condition meets the listing for asthma, specifically, subparagraphs B and C(2) of Listing 103.03. (Plaintiff's brief, Doc. # 12)(citing 20 C.F.R. Subpart P, App. 1, §§ 103.03(B) and 103.03(C)(2)).[3] "'For a claimant to show that his impairment matches a listing, it must meet

---

[3] Plaintiff's substantive argument is directed to explaining how the evidence demonstrates that she "meets" the requirements of the listings. (See Doc. # 12, pp. 3-7)(citing the evidence that she contends demonstrates that she experienced six attacks of the severity required by Listing 103.03(B) and pp. 7-12 (setting forth the evidence that she contends demonstrates that she had a sufficient frequency of and length of steroid treatment and the absence of extended symptom-free periods required by Listing 103.03(C)(2)). On a couple of instances she adds the words "and equals" to her argument. (See Doc. # 12, p. 5 ("The ALJ indicated that H.K.B. did not meet this listing because she 'has not required a physician intervention as frequently as described in the listing.'

*all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." <u>Arrington v. Social Sec. Admin.</u>, 358 Fed. Appx. 89, 93 (11th Cir. 2009)(quoting <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990)(emphasis in <u>Zebley</u>). The asthma listing requires, in relevant part:

> B. Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least ... six times a year. Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks;
>
> Or
>
> C. Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with ...

\* \* \* \* \*

---

(R. 22). The ALJ is mistaken; H.K.B. meets *and equals* this listing.")(emphasis added); p. 7 ("As indicated above, the Listing requires six attacks with physician intervention in a one year period of time. ... H.K.B. had six attacks in 2008 and therefore meets *and equals* this listing.")(emphasis added); p. 12 (concluding, after explaining how the evidence shows that she "meets" the listing requirements for corticosteroid treatment and absence of symptom-free periods, that "H.K.B. meets *or equals* listing 103.03C")(emphasis added)). Outside of the mere inclusion of these two-word phrases, plaintiff presents no argument that her condition either medically equals and/or functionally equals the listing and she cites no medical expert opinion so concluding. She seeks an award of benefits or, in the alternative, a sentence four remand including instructions to "properly evaluate H.K.B.'s asthma *as a listed impairment*[.]" (<u>Id</u>.)(emphasis added). At the hearing, plaintiff's counsel argued only that she "meets" the asthma listing. (R. 39-40). She alleged no functional limitations in her child function report. (Exhibit 2E). She further seeks an instruction, in the event of remand, that the Commissioner "accord proper weight to the treating physicians' medical opinions[.]" (<u>Id</u>.). The body of her brief, however, includes no argument that the ALJ did not accord the weight due to any particular medical opinion of any treating physician. Plaintiff's brief cannot fairly be read to raise issues of medical or functional equivalence or error in the weight assigned to a treating doctor's opinion. The court understands plaintiff's brief to raise only the issue of whether she "meets" Listing 103.03.

> 2. Short course of corticosteroids that average more than 5 days
> per month for at least 3 months during a 12-month period.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 103.03. The listings define "Attacks of asthma" as "prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting" and must be demonstrated by "medical evidence ... includ[ing] information documenting adherence to a prescribed regimen of treatment as well as a description of physical signs." Id., § 3.00(C). The ALJ concluded that plaintiff's impairment does not meet the criteria of subparagraph B because she "has not required a physician's intervention as frequently as described in the listing[.]" (R. 22). She further concluded that plaintiff "has not suffered the persistent symptoms described in subsection C[.]" (Id.).[4]

---

[4] As ordered by the court, plaintiff filed an evidentiary summary on March 28, 2013. (Doc. ## 16, 17). While the summary is useful, plaintiff omits relevant findings that are less favorable to her litigation position. For example, her entry for a November 1, 2007 office visit lists the doctor's "Relevant Findings," upon examination of plaintiff's chest, of "no increased work of breathing" and "Moderate rhonchi a[re] noted in RUL and LUL." (Doc. # 17-1, p. 8). The doctor's note reads, "There is no increased work of breathing. *Breath sounds are normal. Aeration is good. There is no wheezing noted. There are no rales noted.* Moderate ronchi [sic] are noted in the RUL and in the LUL. *There are no crackles noted.*" (R. 216). As to another instance of treatment, plaintiff argues in her brief that she "was again treated for a bronchospasm on April 17, 2008." (Doc. # 12, p. 6)(citing R. 198, 225). However, the only "Relevant Finding[]" plaintiff identifies in her evidentiary summary for that date is, "Nose is congested, watering with significant mucous and drainage[.]" (Doc. # 17-1, p. 15). The treatment record indicates that plaintiff's mother reported that she had given plaintiff several breathing treatments the previous night – her first night home after her hospitalization for bronchospasm – "because she seemed to be coughing and wheezing." (R. 225). Plaintiff's doctor noted, "Physical examination today reveals patient in no distress. TM's are clear. Nose is congested watering with significant mucous and drainage. Throat is clear. Neck is supple. *Chest has excellent air movement in all areas and easy respiration with no increased work of breathing. No wheezes are heard at this time. The patient has normal I to E ratios.*" (R. 225).

## *§ 103.03(B)*

Plaintiff identifies the episodes in 2008 that she claims are "attacks" meeting the requirements of subparagraph B – January 14, January 16, April 14-16 (hospitalization); and December 3-5 (hospitalization). (Doc. # 12, p. 5 (citing R. 164, 220, 221, 251, 255); id. at p. 7 ("H.K.B. had six attacks with physician intervention in 2008. Specifically, she had attacks on January 14, 2008 and January 16, 2008. Then, she had overnight hospitalizations to treat her attacks on April 14-16, 2008, and December 3-5, 2008.")(citing R. 164, 220, 221, 251, 255)). The Commissioner agrees that the two hospitalizations each count as two attacks under Listing 103.03B, but contends that the episodes on January 14, 2008 and January 16, 2008 did not amount to "attacks as defined in Listing 3.00C." (Doc. # 14, p. 8). Because subparagraph B requires six attacks within a twelve month period, plaintiff's argument fails if either of these January 2008 instances do not satisfy the listing's definition of "attack."[5]

---

There are other similarly deficient entries. While the appendices required by this court's order need not list every clinical observation included in the medical records, the court expects that they will reflect a diligent effort by counsel to present a balanced summary of the evidence.

[5] Plaintiff does not claim expressly that she suffered a qualifying asthma attack on March 21, 2008. (See Doc. # 12, pp. 5, 7)(listing attacks requiring physician intervention). However, she argues that "[s]he had wheezing on exam *and a nebulizer was used in Dr. Williams' office*" on that date. (Id., p. 6 (citing R. 223)(emphasis added)). This is not so, at least not to the extent that plaintiff implies that she was *treated* by nebulizer in Dr. Williams' office. The treatment record for March 21, 2008 does not evidence administration of medication to plaintiff by nebulizer during that office visit. Instead, the doctor "[d]emonstrated/evaluated patient's use of a nebulizer" on that date, as plaintiff indicates in her later-filed evidentiary summary. (Doc. # 17-1, p. 13; see also R. 223 (same) and R. 224 (under "Procedures," listing "Office Visit - Expanded" and "Demo Inhalation Device"). Plaintiff makes other misleading statements in her brief. For instance, she argues that "[o]n April 23, 2008, H.K.B. *again presented for treatment of a bronchospasm*." (Doc. # 12, p. 6)(emphasis added). Her treatment record for that date does, indeed, list a diagnosis of bronchospasm. (R. 225-26). However, while plaintiff's mother and the doctor "[d]iscussed

In the early morning hours of January 14, 2008, plaintiff's mother took her to the Flowers Hospital emergency room complaining of fever and vomiting. Plaintiff's temperature was 102.8°, but her $O_2$ saturation was "100%." (R. 176). The triage nurse noted "nml breath sounds" and "no respiratory distress" on physical examination. (Id.). He circled "none" under "MEDS" (id.) and, at 3:48 a.m., he gave her an oral dose of Motrin (R. 177). The ER physician also checked "None" in the block for medications (R. 178), indicated "no resp. distress" and "breath sounds nml" upon physical examination (R. 180), and recorded that plaintiff's chest x-ray was normal (id.; see also R. 179 (x-ray report)). The physician assessed fever and upper respiratory infection and discharged plaintiff, giving her a prescription for Amoxil. (R. 177, 180). Later that day, plaintiff's mother took her to her pediatrician's office. She told the doctor about the earlier ER visit and diagnosis, and complained that plaintiff was now wheezing and had a worsening cough followed by vomiting. The doctor noted, "On no Medications." (R. 220). On physical examination, the doctor noted "mildly increased work of breathing" and diffuse moderate wheezes, but no rales or rhonchi, and diagnosed "Acute Bronchiolitis[.]" (R. 220). Plaintiff received Xopenex by nebulizer at the physician's office and a prescription for a home nebulizer

---

Bronchospasm" (see R. 225, under "History"), the sole abnormal finding on physical examination was "[m]ild nasal drainage" (id., "Physical Exam"). Plaintiff's *primary* diagnosis for that visit is "V 202 Well Child Care[,]" as plaintiff acknowledges in her evidentiary summary. (See R. 226; Doc. # 17-1, p. 15). Plaintiff further argues that, "[o]n October 15, 2008, H.K.B. was also treated for bronchospasm." (Doc. # 12, p. 6). This, too, was a "well child" visit. (R. 233; see Doc. # 17-1, p. 18). In presenting arguments to the court, the better approach is to do so with the expectation that the court will review the evidence.

9

machine and Albuterol, to be used every two to four hours as needed for wheezing. (Id.; see also R. 162-63).

The Commissioner contends that this episode is not an "attack" for purposes of the listing because plaintiff was "not on a prescribed regimen of treatment as required under Listing 3.00(C)" at the time of the January 14, 2008 episode, and had only a "simple nebulizer treatment" rather than the intensive treatment required by the listing. (Doc. # 14, pp. 8-9). As the Commissioner argues, the treatment notes for that day indicate that plaintiff was on no medications at the time. (R. 176, 178, 220). Thus, even assuming that the in-office nebulizer treatment is "prolonged inhalational bronchodilator therapy" as required by § 3.00(C), this episode does not qualify as an "attack" for purposes of Listing 103.03(B). (See § 103.03(B)(requiring "[a]ttacks (as defined in 3.00C), *in spite of prescribed treatment* and requiring physician intervention")(emphasis added); § 3.00(C)(requiring medical evidence documenting "adherence to a prescribed regimen of treatment"); § 103.03(A)("[T]he asthma listing specifically includes a requirement for continuing signs and symptoms despite a regimen of prescribed treatment.").

Plaintiff contends that she also had a qualifying "attack" on January 16, 2008. On that day, plaintiff's mother took her back to the pediatrician's office, complaining that she had continued to vomit and wheeze. (R. 221). The physician wrote:

> On exam today, she is alert and vigorous and appears to be in no significant distress. She is playful and happy. Her pharynx is clear. Mucous membranes are moist. Both TM's are normal. There is a serous discharge in her nostrils. Neck is supple. Chest exam reveals coarse expiratory wheezes bilaterally. I

>hear no rales. Air exchange is adequate. There are no retractions and only minimal increased work of breathing. Abdomen is soft. Bowel sounds are normally active. Again, she is alert and vigorous. 02 saturation today was 97%.

(Id.). The physician again diagnosed acute bronchiolitis, gave plaintiff a Decadron shot "to decrease airway swelling," prescribed a three-day course of Orapred, and sent her for a chest x-ray. The x-ray showed "mild bilateral peribronchial cuffing, probably a mild viral pneumonitis" and was otherwise negative. (Id.; see also R. 172). The Commissioner points out that the treatment record does not evidence any "intensive treatment in a hospital, emergency room or equivalent setting." (Doc. # 14, p. 9; see also § 3.00(C)). Plaintiff's contention that the treatment record for this visit evidences an "attack" rests, apparently, on her previous misunderstanding that the "pulse ox/O2 SAT" annotated in the treatment record is a "breathing treatment." (Doc. # 12, p. 6). In a footnote within her later-filed evidentiary summary, however, plaintiff's counsel apologizes for her error, noting that "[p]ulse ox is not a breathing treatment, but a measurement of the blood oxygen and hemoglobin levels" (Doc. # 17-1, p. 10 n. 3); however, she does not withdraw her allegation of error as to § 103.03(B). The evidence, as the Commissioner contends, does not establish that plaintiff suffered a qualifying "attack" on January 16, 2008.

Of the episodes plaintiff identifies as qualifying "attacks," only the two hospitalizations count for purposes of § 103.03(B), for a total of four "attacks" in 2008. Plaintiff does not contend that she suffered a sufficient number of qualifying attacks in any other twelve month period. Thus, the ALJ's conclusion that plaintiff's condition does not

meet the requirements of § 103.03(B) is supported by substantial evidence.

*§ 103.03(C)(2)*

As noted above, subsection C(2) of the asthma listing requires evidence of: (1) "[p]ersistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators; and (2) treatment with "short course[s] of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 103.03(C)(2). The ALJ concluded that plaintiff did not meet the requirements of subparagraph C because she "has not suffered the persistent symptoms described in subsection C." (R. 22). Plaintiff contends that she meets this listing because the record demonstrates that she has been treated with short courses of steroids with the required frequency, and because her "history and medical records provide evidence documenting the absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators." (Doc. # 12, p. 8).[6] The Commissioner maintains that substantial evidence of record supports a reasonable conclusion that plaintiff experienced extended symptom-free periods as described in the listing and, therefore, that the Commissioner's decision is due to be affirmed. (Doc. # 14, pp. 10-11). As the Commissioner argues, the court must affirm if the ALJ's decision is supported by substantial evidence – *i.e.* "such relevant evidence as a reasonable person would accept as adequate to

---

[6] Plaintiff points to her use of short courses of the corticosteroid Prednisolone and the sympathomimetic bronchodilator Albuterol. (Doc. # 8, p. 8).

support a conclusion" – "even if the evidence preponderates against the Commissioner's findings[.]" Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1158-59 (11th Cir. 2004)(citations and internal quotation marks omitted).

The treatment of plaintiff's asthma with the short courses of steroids is not sufficient, standing alone, to meet the listing. Instead, plaintiff must satisfy all of the listing's requirements. Arrington, 358 Fed. Appx. at 93. The Commissioner does not dispute plaintiff's treatment with short courses of steroids of the frequency and duration required by the listing; instead, both the ALJ's stated rationale and the Commissioner's argument before this court focus on whether plaintiff suffered the persistent symptoms required by the listing. (Id.; R. 22). The ALJ's conclusion that she did not is supported by substantial evidence, as the record permits a reasonable conclusion that there have been extended periods during which plaintiff was free of symptoms requiring the daytime and nocturnal use of sympathomimetic bronchodilators.

Plaintiff's alleged onset date is January 14, 2008; plaintiff was first prescribed Albuterol on that date. (R. 19, 39-40, 220; see also Doc. # 17-1, plaintiff's summary of the evidence). Plaintiff cites her pharmacy records to demonstrate her use of short courses of corticosteroids (Doc. # 12, p. 8); those same records show that the pharmacies dispensed Albuterol as follows:

1/15/08 – a 10-day supply dispensed, with no refills prescribed (R. 154, 163, 220);

2/21/08 – an 8-day supply dispensed, with no refills prescribed (R. 151, 223, 258);

>12/2/08 – a 10-day supply dispensed, with no refills prescribed (R. 148, 250, 258);

>1/4/10  – a 6-day supply dispensed, with no refills prescribed (R. 141, 315);

>2/15/10 – a 6-day supply dispensed, with 5 refills prescribed (R. 141, 339);

>7/12/10 – a 6-day supply dispensed (R. 140).

(See Exhibits 9E, 10E, 11E, 12E).[7]  Plaintiff also received Albuterol treatments periodically throughout her hospitalization in April 2008 and December 2008, but was discharged with instructions to continue its use on a "PRN basis." (R. 164, 255).  Although there are periods of time during which plaintiff used Albuterol frequently, her medical record also reflects extended periods during which there is no mention of the use of Albuterol in treatment notes.  For instance, in the seven months between mid-April 2008 and mid-November 2008, plaintiff's medical record includes no mention of Albuterol treatments, despite the fact that plaintiff was evaluated at her pediatrician's office or the hospital ER on seventeen occasions during that period.  (See R. 168-71, 173-75, 225-34  (treatment notes for evaluations from 4/23/08 through 11/11/08); see also Doc. # 17-1, plaintiff's summary, pp. 15-18).  Similarly, although plaintiff's treatment notes for the period from December 2, 2008 through April 8, 2009 reflect frequent use of Albuterol (or "rescue meds")(R. 244-56, 300-04), there is no mention of such use thereafter until August 5, 2009 (R. 287-94, 305-07), *i.e.*, for nearly four months.  On September 16, 2009, plaintiff's mother reported that she was using Albuterol

---

[7] Plaintiff's physicians often prescribed at-home use of Albuterol on as-needed basis  (See R. 164, 220, 223, 250, 270, 315).  Thus, the fact that the pharmacy dispensed a "10-day" supply does not mean that plaintiff used that medication on only ten days.

every four hours during the day but used only Singulair at night, and there is no mention of Albuterol in treatment notes for plaintiff's three office visits in October 2009. (R. 309-12). After a period of exacerbated symptoms requiring increased use of Albuterol between early November 2009 and the end of March of 2010, there is no mention of use of Albuterol again for seven months, until plaintiff's mother reported another exacerbation of her asthma in an office visit on October 27, 2010. (R. 312-16, 337-43, 356-58).

At the September 10, 2010 administrative hearing, plaintiff's mother testified that plaintiff "takes her Albuterol treatments as needed[;]" that plaintiff's problems are worse in the fall, winter and spring; and that "during the summer she is fairly okay, but I still may have to give her treatments here and there." (R. 41-42).[8]  She further testified as follows:

> Q   When is the last time that you gave her a breathing treatment?
>
> A   Let's see. I had to give her one I know in June. She was playing and I guess she had overdone it, and she started to have an attack, and I had to give her one then and it pretty much calmed her down. But I haven't really hade to give her, I mean, as far as having to give them back to back, you know, so many times a day since then, but she has had to have one back in July. I didn't have to give any in August, and none so far this month.
>
> Q   Okay. Were you having to give back to back treatments back in April or March?
>
> A   Yes, ma'am.

---

[8] At the hearing before the ALJ, Plaintiff's counsel maintained that she meets the listing. (R. 39). However, he argued that "[i]t does appear from the record that it does seem to be somewhat seasonal in that the worse periods of the year are the spring, the fall, and the winter. The summer months are not so bad." (Id.).

(R. 44). The record includes substantial evidence supporting the ALJ's conclusion that plaintiff does not meet the requirements of Listing 103.03(C)(2).

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is due to be AFFIRMED. A separate judgment will be entered.

DONE, this 6th day of August, 2013.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE